MEMORANDUM OF DECISION
This case is a petition brought by the Commissioner of the Department of Children and Families (DCF) to terminate the parental rights of Leon P., the father of Daelyon C., born on September 1992; Roderick G., the father of Naequon G., born on September 1996; and Melissa C., the mother of both children. Each respondent father has appeared before the court with his counsel and entered his written consent to the termination of his parental rights, Mr. C. on September 21, 2000, and Mr. G. on October 31, 2000. After individually canvassing the respondent father on those dates, this court found that each had made this decision knowingly and voluntarily with the assistance of competent counsel and accepted his consent. As to the respondent mother, the petitions alleges as the statutory basis for terminating her parental rights that she has failed, after her children had earlier been found to be neglected or uncared for, to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, she could assume a responsible position in the life of either. For the reasons stated below, the court finds this matter in favor of the petitioner.
The trial of this case was held before this court on October 30 and 31, 2000. Although represented by counsel and appearing at the courthouse before the commencement of evidence at the first day of trial, the CT Page 2962 respondent left the courthouse before evidence began[3] and did not appear in the courtroom for any of the trial proceedings. The petitioner and the minor children were represented by their respective counsel throughout the proceeding.
The petitioner introduced numerous documentary exhibits into evidence during the trial, including psychological reports and various social studies prepared in this case by the department. The parties elicited testimony from various witnesses called by the petitioner, including a psychologist who conducted court-ordered evaluations, the therapist of one of the children, and the foster father of that child.[4] Although the two DCF social workers who authored the various social studies were present in court on the first day of trial, and one returned for the second day of evidence, the petitioner called neither as a witness, and the respondent's counsel explicitly waived any cross-examination of either.[5] The respondent presented no witnesses or evidence. Counsel for the minor children provided vigorous and thorough cross-examination of the witnesses at trial.
The court finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter. The court finds that all three parents were served with the petitions and have appeared through counsel. No action is pending in any other court affecting custody of these children.
 I — FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social studies entered into evidence as exhibits, and the testimony presented, according to the standards required by law.[6] Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial:
A. EVENTS BEFORE THE NEGLECT ADJUDICATION
Melissa C. was born on May 9, 1974; she is now 26 years of age. She was the fifth of six children born to Lena and Clinton C. Ms. C. completed only the ninth grade of education and did not do well in school. (Pet. Ex. 18 at 2.) She skipped school frequently and, although not repeating any grades, was in special education classes. She cannot read or write well. (Pet. Ex. 2 at 2.) She began using marijuana at age 16 (Id.) and in later years began using cocaine and marijuana laced with cocaine. (Pet. Ex. 18 at 2.) She lived with her parents in New Britain until her father died of cancer in 1995, when she went to live with two older sisters, Wanda and Carolyn, living in Waterbury. (Pet. Ex. 2 at 3.) There she met Leon P. in 1991 (Pet, Ex. 6 at 3), and he fathered her first child, CT Page 2963 Daelyon, born in September 1992. After his birth, Melissa and her new baby continued to live with her sisters. Although Mr. P. would visit his child once or twice a week, an intimate relationship between the parents did not continue. (Pet. Ex. 21 at 3 and 4.) In 1994 Melissa met Roderick G., and in 1996 she gave birth to his son, Naequon. She continued to live with her sisters after her second child was born. (Pet Ex. 6.)
On April 12, 1998, DCF filed petitions alleging that Daelyon and Naequon were neglected in that they had been denied proper care and were being permitted to live in circumstances injurious to their health and well-being. The Summary of Facts[7] substantiating the allegations of neglect recited various facts leading up to the petition:
1. On October 29, 1997, the department had received a report from a mental health clinician working with the family that she was concerned about lack of supervision, filthy conditions in the home and possible substance abuse by the respondent and her sister. She had observed both of them sleeping during home visits and school-age children not in school but instead running unsupervised around the housing project where their apartment was located.
2. In five subsequent home visits, DCF investigators observed the home to be overcrowded and extremely filthy.
3. In December 1997 a school social worker reported that Daelyon had missed 27 days of school, been tardy numerous times, complained about being hungry, and appeared to be very tired and sad when at school.
4. That same month the children's pediatrician reported that the respondent had missed half of her children's medical clinic appointments. The pediatrician stated that she suspected there was little structure or routine in the children's lives, as Daelyon had a bedtime of 10:00 p.m. although only three years old, and had choked on a large piece of candy when left unsupervised at 19 months of age.
5. DCF had referred Melissa C. for substance abuse testing and since February 1, 1998, she had tested positive three times for illegal drug usage — positive for cocaine on February 9 and for cocaine and cannabinoids on February 24 and 28. (Stipulation of parties.) She had refused to attend a drug treatment program to which DCF had referred her.
6. Ms. C. had attempted to commit suicide in the presence of her children on March 30, 1998, by overdosing on muscle relaxer medication.
7. In April 1998 school authorities reported Daelyon to be out of CT Page 2964 control, volatile, and assaultive on the bus and at school. They also reported that Ms. C. had failed to respond to numerous letters the school had sent her. (Pet. Ex. 2 at 7.)
A social study prepared by DCF social worker Penelope Guerra and dated May 18, 1998, depicted Ms. C's initial attitude toward the problems that led DCF to intervene in her family. She told DCF staff that although she had twice attempted to commit suicide, but had never had any mental health counseling. Admitting that she had begun using drugs at age sixteen and had used cocaine for the last five years, she claimed that she was not drug dependent and "never felt that her marijuana, alcohol, or cocaine use had been . . . problems for her or affected her life in any way." She had not participated in drug treatment programs to which DCF referred her and continued to use illegal drugs. (Pet. Ex. 2 at 4.)
On August 7, 1998, a DCF worker conducted a home visit to the Waterbury home where the respondent was staying with her two children. The respondent's sister, Carolyn, opened the door and said that respondent was not home and had gone to New York. DCF had previously warned the respondent not to leave her children with Carolyn, because DCF believed this sister was not an appropriate caretaker. A Superior Court judge had previously found Carolyn incompetent in a juvenile proceeding, and her children had already been removed from her care due to mental health issues and her failure to supervise her children properly. When the worker requested to see the children, Carolyn immediately run upstairs in a panic. Following her upstairs, the worker found 23-month-old Naequon and his one-year-old cousin, Ian, in a bathtub filled with water. Naequon was crying and attempting to pull his cousin up from under the water. The DCF worker concluded that the sister had left the children unsupervised in the bathtub with the water running and been downstairs talking on the telephone with the music blaring where she had been unable to hear the children crying. After consulting with a DCF social worker supervisor by telephone, the DCF worker invoked a 96-hour hold on both infants. An eight-year-old cousin living in the house informed the DCF social worker that the respondent was in New York City with her sister, Wanda, and that Daelyon was at his grandmother's home in Waterbury. (Pet. Ex. 3 at 2 and 3.) The court, Swienton, J., three days later, on August 10, 1998, issued an Order of Temporary Custody (OTC) as to Naequon.
On August 21, 1998, the respondent entered written pleas of nolo contendere to both neglect counts in both neglect petitions. After duly canvassing the respondent on her pleas, the court, Swienton, J., accepted the pleas, entered adjudications of neglect, ordered the OTC to remain in effect, and continued the cases until September 25, 1998, for a disposition hearing. CT Page 2965
B. EVENTS AFTER THE NEGLECT ADJUDICATION
 1. Initial Placements of the children
After removing Naequon from the respondent's home, the department learned that Leon P. had taken Daelyon into his household in Waterbury. A social study prepared for the disposition hearing reported the Mr. P. was living with a woman and her ten-year-old son and that both adults had welcomed Daelyon into their home. After visiting that home on September 10, a DCF social worker concluded that Daelyon appeared to be "happy and comfortable in his Father's home" and that both adults were "affectionate toward the child" and "eager and willing to have Daelyon live with them." (Pet. Ex. 4 at 2 and 3.)
At the neglect disposition hearing on September 21, 1998, both respondent fathers entered written pleas of nolo contendere to the neglect petitions. The court, Swienton, J., found that they did so knowingly and voluntarily and entered adjudications of neglect as to them. After all parties reached an agreement as to the disposition of the neglect petitions, the court committed Naequon to the care and custody of the department for a period of one year until September 25, 1999; it transferred sole guardianship of Daelyon to his father, Mr. P., and placed Daelyon under protective supervision in the care of his father for a similar one-year period.
Shortly after the court had placed Daelyon with his father, Mr. P. was sentenced to prison for a possession of narcotics charge that had been pending since May 1998 but he had not disclosed to the department. After learning that Mr. P. had made arrangements for his son to live with Daelyon's paternal aunt, Jeanine P., in Waterbury, a DCF social worker visited Ms. P.'s home on November 11, 1998. She found the apartment dirty and disorganized and learned that Daelyon shared a bedroom with his nine-year-old female cousin. On a school visit two days later, Daelyon told the worker that he was afraid of his aunt because she would hit and scratch him. He showed the worker discoloration marks on his neck and back and said his aunt had "hurt him with a belt." Daelyon also reported that he had become scared when he saw his uncle and aunt in a fist fight during which his uncle punched his aunt in the face. (Pet. Ex. 5 at 2.) DCF issued a 96-hour hold and removed Daelyon from his aunt's household. On November 23, 1998, the court, Ward, J., confirmed an order of temporary custody;
On November 18, 1998, the department moved to reopen the Order of Protective Supervision entered in September and commit Daelyon to the custody of the Commissioner of DCF. On June 3, 1999, the court, Ward,J., granted that motion, and committed Daelyon to DCF for a period of one CT Page 2966 year, until June 3, 2000.
2. The Mother, Melissa C.
 a. Court orders to facilitate reunification
On August 10, September 25, and November 17, 1998, the court (Swienton, J., and Ward, J.,) entered specific steps and expectations to facilitate return of the children to Ms. C., among which were the following:
 • Keep all appointments set by DCF. Cooperate with DCF home visits, announced or unannounced.
 • Keep whereabouts known to DCF and your Attorney.
• Visit the children as often as DCF permits.
• No substance abuse
 • Participate in parenting, individual, and drug and alcohol counseling;
 • Undergo drug and alcohol assessments and follow any resulting treatment recommendations;
 • Secure and maintain adequate housing and income; and
 • No involvement with the criminal justice system.[8]
 b. Substance Abuse
To assist Ms. C. in addressing her substance abuse problems, the department referred her in the next year and a half to numerous in-patient and out-patient substance abuse treatment programs. Unfortunately, she has never successfully completed substance abuse treatment. (Pet. Ex. 12 at 2.) As of January 2000, she had been unsuccessfully discharged five times from the Lifeline Substance Abuse Treatment Facility and three times from the Hillcrest Substance Abuse Treatment Program for not attending regularly or remaining free of controlled substances. (Pet. Ex. 8 at 4 and 5; Pet. Ex. 9 at 10; Stipulation of Parties.) Her history of substance abuse testing and treatment includes the following: CT Page 2967
 • After three positive tests for illegal drugs in February 1998 at Catholic Family Services, she was referred to the Lifeline Treatment Program run by the Wheeler Clinic on March 16, 1998. On March 16, she tested positive for cocaine, and on March 26, April 1, and April 22, she tested positive for cocaine and cannabinoids. She was discharged from the program on April 30, 1998, for not attending regularly, with a recommendation that she get involved in long-term residential treatment at one of several specified facilities. (Stipulation of Parties.)
 • In June 1998 she attended the Hillcrest drug treatment program affiliated with New Britain Memorial Hospital for six weeks. She was discharged in July 1998 for failing to attend scheduled appointments. Id.
 • Although she then agreed to participate in a Drug and Alcohol Evaluation on July 29, 1998, she missed that appointment. (Pet Ex. 4 at 3.)
On February 24, 1999, a drug evaluation performed by Catholic Family Services found her positive for both cocaine and cannabinoids, and she was again referred to the Lifeline Program for a day treatment program. Id.
 • On March 1, 1999, a drug screen conducted by Wheeler Clinic was positive for the presence of marijuana. (Id.) Wheeler recommended that she participate in an intensive in-patient program because of "her inability to retain sobriety in an outpatient setting," but she refused to do so. (Pet. Ex. 7 at 5.) While at Lifeline for the next two months she was uncooperative, hostile, angry, and noncompliant. (Id.) Wheeler discharged her on April 15, 1999, for not showing up regularly and recommended that she engage in long-term in-patient residential treatment (Stipulation of Parties.)
 • After DCF referred her to inpatient drug treatment programs at Blue Hill Hospital, the Carnes-Weeks program, and Rushford Treatment Facility, Ms. C. agreed to attend an intake CT Page 2968 appointment for an in-patient on September 21, 1999, but she failed to attend the appointment although DCF had been willing to provide her with transportation to it. (Pet. Ex. 9 at 5.)
 • On February 10, 2000, she was referred to a drug treatment program at Community Health Services in Hartford. A February 21 drug screen there was positive for cocaine and cannabinoids. (Stipulation of Parties.) Another drug test on March 31, 2000, was again positive for both. (Pet. Ex. 11 at 3.) She was referred for out-patient group treatment scheduled to begin on February 23, 2000, but never attended any of the treatment sessions. (Pet Ex. 12 at 1 and 2.) She was discharged on March 24, 2000, for failing to show up for scheduled appointments.
Id.
During this period, Melissa C. twice discussed her unsuccessful substance abuse treatment with Dr. Robert Meier, a psychologist performing court-ordered evaluations of the respondent and her children. Despite a positive drug screen on March 1, 1999, on March 18, 1999, she told Dr. Meier that she had not used drugs "in about a month" and explained that she had stopped attending the Lifeline program "because she did not like it." (Pet Ex. 18 at 2.) During an interview with Dr. Meier in April 2000, she initially denied any drug use for the previous year, but then admitted testing positive for marijuana the month before. She explained to Dr. Meier that she had been in a "substance abuse program in Hartford, but remained less than a week." She said that she had been terminated from the program not attending; when Dr. Meier asked why, she said that "she is not a morning person, and had to be at the agency by 9:30 A.M." (Pet. Ex. 21 at 6.)
c. Parenting Skills and Interaction with her Children
DCF also referred Ms. C. to various services to help her improve her parenting skills. The department referred her to individual counseling, parent support groups and anger management classes, but she never attended any of these. (Pet. Ex. 6 at 11; Pet. Ex. 9 at 10.) Before filing the neglect petition, DCF had referred her in June 1998 to the Visiting Nurse Association in New Britain for parent aid services. She was discharged from the parent aid program on July 24, 1998. "for her noncompliance and resistance" after missing half of the scheduled appointments with the parent aid. (Pet Ex. 4 at 3.) CT Page 2969
The department also provided supervised visits with Daelyon and Naequon. The therapist, Ada Rodriguez, testified that the respondent needed help and interventions during these visits, even on simple things like providing snacks. (Testimony of Ada Rodriguez.) Petitioner's Exhibit 46 is a summary of notes on those supervised visits made from December 1998 through November 1999 by staff at the Wheeler Clinic, where the visits were held. Those notes stated that in the initial visits Ms. C. displayed little control over her children and interacted more as a peer than a parent. (Pet. Ex. 46 at 1, notes of December 1998 sessions.) For example, on December 9, the visit supervisor, Ms. Penny Kobles, "needed to intervene to structure visit regarding appropriate snacks and activities;" and on December 16, she had to "let Ms. C know its OK to set limits with Daelyon." (Pet. Ex. 46 at 1.) In January 1999, she arrived at two visits, on January 6 and January 13, appearing to be "under the influence." At the January 6 session, she was hostile and on January 13 Daelyon became agitated after she paid little attention to him. By March 1999, however, despite missing the five visits in January and February. Wheeler staff observing the visits noted that she was "showing improvement in settling limits with the boys" (Id. at 2, March 19 session) and "improvement in parenting skills" (Id., March 26 session).
Ms. C. missed visitation appointments with her sons on March 12, April 23, April 30, May 7 and May 28, 1999, without notifying the department in advance. She missed three more visits in July, on July 1, July 16, and July 29. (Pet. Ex. 46 at 3.) Her two sons would become angry and upset waiting for their mother to arrive. (Pet. Ex. 7 at 3; Pet. Ex. 8 at 3.) Because of the children's reactions to the missed visits, the department suspended the respondent mother's visits with her children in August. (Pet. Ex. 9 at 12.) On October 6, 1999, she appeared to be under the influence when she showed up for the visit.[9] (Pet Ex. 9 at 11; Pet. Ex. 46 at 3; testimony of Sam C.) Daelyon's therapist then recommended that the visits be cancelled because they were detrimental to his best interest, and the department ceased visits between Ms. C. and Daelyon. (Pet. Ex. 12 at 12.)
The department continued to allow Ms. C. to visit with Naequon, however. She did not show up for visits with him in December and January, and her whereabouts was unknown to the department. On Ms. C.'s request, biweekly supervised visits with Naequon resumed on March 9, 2000; but between that date and the date trial began, she missed fourteen of eighteen. scheduled visits. Id.
In April 2000, Dr. Meier conducted an evaluation of Ms. C.'s interactions with her children. When she was with Naequon by himself, before Daelyon arrived for the session, she was at first generally appropriate but as time passed she become inconsistent in setting limits CT Page 2970 for him. Dr. Meier found her to be "quite limited in her repertoire of behaviors in attempting to engage her son." He concluded that "[h]er goal seemed to be to get a reaction from him as opposed to a minimal interaction." (Pet. Ex. 21 at 7.) When Daelyon arrived for the visit, he brought his mother some pictures and other items, some of which she gave to Naequon when he left. Dr. Meier observed in his written evaluation report that, "Daelyon seemed a bit hurt that she did this without asking him." (Pet. Ex. 21 at 8.) Dr. Meier concluded that she
 interacted with both children using limited skill and judgment. In many respects, she interacted more like a peer, showing her anger openly through her comments, and trying to win their approval as opposed to being supportive and sensitive to their needs.
(Id. at 8.)
After Naequon left and she was just with Daelyon, she made inappropriate remarks that although apparently intended in jest hurt her son's feelings:
 When she asked if he played football, and he said no, Ms. C. said, "You're not manly enough?" She then commented about his not playing well enough.
(Id.) This remark was emotionally devastating to Daelyon. (Testimony of Dr. Robert Meier.)
d. Performance on other court expectations
 • Ms. C. did not show up for a court-ordered psychological examination on January 26, 1999 (Pet. Ex. 18 at 1), or court-ordered child/parent evaluations on December 1, 1999, or January 27, 2000. (Pet. Ex. 12 at 1.)
 • Ms. C. has not maintained employment. She held a job briefly at McDonalds in February 1999, but had no employment in June 1999 (Pet Ex. 7 at 5), November 1999 (Pet. Ex. 8 at 5), May 2000 (Pet Ex. 10 at 4), June 2000 (Pet Ex. 11 at 4), or October 2000 (Pet. Ex. 12 at 1.)
 • She did not secure her own apartment. Between June 1999 until February 2000 she moved back and forth between her mother's residence in New CT Page 2971 Britain, her sister's apartment in New Britain, and a friend's home in Waterbury. Her whereabouts was unknown to DCF in December 1999 and January 2000. In February 2000 she reported to DCF that she was living with a gentleman friend in an apartment leased under his name in Hartford. (Pet. Ex. 7 at 6; Pet. Ex. 8 at 6; Pet. Ex. 9 at 12; Pet. Ex. 10 at 4; Pet. Ex. 12 at 1.)
 3. The child Daelyon
 a. Foster care placement history
Since being removed from his aunt's home in Waterbury in November 1999, Daelyon has been in five separate foster placements. (Pet. Ex. 8 at 6.) Three of those ended because of sexualized and aggressive behavior on his part. (Id.) A week after being placed in his first foster home, for example, the foster mother found him in bed with her five-year-old son, neither child wearing any pajamas. Daelyon told the foster mother that "they were `playing a game' and he had `bit' her son's `pee pee.'" (Pet. Ex. 9 at 6.) Her son told her that "they had bit each other's pee-pee" and that Daelyon had "put his `pee-pee in his butt.'" (Id. at 6 and 7)[10]
DCF immediately removed Daelyon from that home and placed him in a specialized foster care home where he could be closely monitored and began providing weekly individual therapy sessions for Daelyon with Ada Rodriguez, a licensed professional counselor at the Wheeler Clinic. (Id. at 7; testimony of Ada Rodriguez.) These sessions initially lasted between one-half and a full hour each week. (Id.) During this therapy and the psychiatric evaluation, Daelyon disclosed that while he had been living with his aunt in Waterbury, a nine-year-old female cousin, Asia, "had touched his genitals with her hand for a long time" a week before the first foster home incident. (Pet. Ex. 22 at 2; testimony of Ada Rodriguez.)
Dr. Miller's report of his psychiatric evaluation describes two other incidents of Daelyon acting out sexually in a foster home. Daelyon said to a 12-year-old foster sister "I have a big dick" and then "asked if they could hump a pillow together." Another time he "feigned falling and grabbed toward her genital region." (Pet Ex. 22 at 1.) Although the record does not disclose if this foster home was one of the placements disrupted by his sexualized behavior, Daelyon eventually left this foster home in July 1999. He was then placed in the home of Mr. Sam C., a specialized foster care placement that the department now proposes as a pre-adoptive home. (Pet. Ex. 12 at 4.) Mr. C. has provided a stable, CT Page 2972 positive, nurturing environment that meets all of Daelyon's medical, educational, emotional, and psychiatric needs. (Pet. Ex. 9 at 3 and 14.) Daelyon has adjusted well there and did well at school during the 1999-2000 academic year. (Id. at 5.)
b. Relationship to his mother, the respondent
In an April 1999 psychological evaluation, based on an interview with Daelyon on January 26, 1999, and a joint interview with mother and son on March 18, 1999, Dr. Meier concluded that "Daelyon is clearly attached to his mother and most likely views her as the psychological parent[11]. . . . The child was happy to see his mother and clearly seeks her attention and love." He very presciently reported, however, that "[w]hile this may be a positive factor if reunification can occur, it can lead to great disappointment on the part of the child if mother fails to meet her responsibility. . . ." (Pet. Ex. 18 at 6.)
His mother's visits have, in fact, caused great distress for Daelyon. After being removed from her care, however, he became angry and hated himself for being apart from his mother. (Pet. Ex. 27 at 1.) In the first few months after removal from her care, both the visit with his mother and his separation from her at the end of each visit caused distress for him. Although Dr. Meier initially concluded from his January 1999 evaluation of Daelyon that he "seemed" to have a "positive reaction" to the visits (Pet. Ex. 18 at 4, both the therapist and school authorities noticed an increase in his restlessness and aggression before and after each visit. (Pet. Ex. 27 at 1.) When his mother started missing more and more visits during 1999, the stress of not seeing her grew even worse. Her not showing up for the visits had a very strong and detrimental effect on Daelyon. He would be anxious about her health or worry that he had done something wrong that caused her to miss the visit. He would blame himself for her not visiting and feel he wasn't worth anything. (Test. of Ada Rodriguez.) He would become was angry and disappointed at his mother for not complying with her substance abuse treatment and not showing up for visits, and tell his therapist that he felt abandoned and betrayed by his mother. (Pet. Ex. 8 at 7.)[12] His mother's no-shows led to withdrawn, sad behavior in the foster home (Pet. Ex. 8 at 7) and aggression at school. (Testimony of Ada Rodriguez.)
After Ms. C. showed up late for the October 6, 1999, visit and appearing intoxicated, Daelyon broke down in tears on the car ride home with his foster father. (Testimony of A. Rodriguez.). He cried and was very upset for several days. (Testimony of Sam C.) As a result, Ms. Rodriguez and the specialized foster care team at Wheeler Clinic recommended to DCF that visits not be resumed with his mother until she CT Page 2973 had attended and completed a treatment program and demonstrated she could stay clean:
 Visits have been stopped several times for lack of consistency, and the last time after Ms. C. came to the visit apparently under the influence of some kind of substance. . . . [I]t is a concern for Daelyon to have to see his mother in that state and go through the disappointment of not being able to visit with her. This causes a lot of Distress for Daelyon. He is currently doing extremely well at the foster home and school. and we would not want to see this placement disrupt.
(Pet. Ex. 27 at 2; memo from Ada Rodriguez to DCF.)
Daelyon tends to be very sensitive; Dr. Meier observed, during Daelyon's interactions with his mother, that Daelyon often tried to please her to get a positive reaction but was often disappointed — one example of such disappointment being when she gave to Naequon the gifts that Daelyon had brought for her to the March 2000 interactional evaluation. Dr. Meier said that he believed Daelyon felt this as a rejection by her. (Testimony of Dr. R. Meier.) She caused him disappointments in other ways as well. He would take it personally when she criticized or blamed him for anything; thus, her remark about his not being manly enough to play football was devastating to Daelyon. Ada Rodriguez testified that he felt constant disappointment at her failing to show up for so many visits. Ms. Rodriguez testified that every time she did not show up, the therapy that followed required a lot of time to process his anger for her not being there for him. (Testimony of Ada Rodriguez.)
At the time of 1999 psychological evaluations, Daelyon still saw Ms. C as his caretaker. Since then. as others have met his primary needs, Daelyon's perceptions have changed. Thus, in Dr. Meier's last session with mother and son, Daelyon no longer saw her as someone he could go home to and who would meet his needs and take care of him. (Pet. Ex. 21 at 8; Testimony of Dr. R. Meier.) He knows that Melissa C. is his mother (Id.); loves, misses. and cares about her; worries about her; wants to know that she is okay; and still has a strong bond to her. (Testimony of Ada Rodriguez.) Yet despite this strong bond, he cannot rely on her for emotional support. (Pet. Ex. 21 at 8). He no longer tells his therapist, as he once did, that he wants to see her. (Testimony of Ada Rodriguez.) Although he once asked frequently about his mother, he does not do so very often anymore. (Testimony of Sam C.) Instead, Daelyon has developed a close emotional bond with his foster father (Pet. Ex. 9 at 10.), who CT Page 2974 has provided a safe nurturing environment for Daelyon since his placement there in July 1999. Daelyon has told his therapist that he wants to continue living with Sam C. and for Mr. C. to adopt him. (Testimony of A. Rodriguez; Pet. Ex. 12 at 5.) The court thus finds credible Dr. Meier's testimony that by the time of trial Ms. C. was no longer Daelyon's psychological parent and there was no longer any current ongoing parent-child relationship of a positive nature between Daelyon and Ms. C. (Pet. Ex. 21 at 8; testimony of Dr. R. Meier.)
c. Present needs and interest of the child
Daelyon has been clinically diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), not otherwise specified, since he has some but not all of the symptoms of ADHD. Being molested by his female cousin in the Waterbury home resulted in a diagnosis of Post-Traumatic Stress Disorder as well. (Testimony of Ada Rodriguez; Pet. Ex. 22 at 3.) When Daelyon entered therapy, these problems manifested themselves both at home and school. He was very easily distracted, had difficulty concentrating, was fidgety and restless. He had some difficulties and showed aggressiveness interacting with other children. At school he required a lot of individual, one-to-one attention. Id.
Ms. Rodriguez began seeing him in individual therapy and in family therapy with his foster parent in November 1998 to address these problems. Dr. Miller concluded during the March 1999 psychiatric evaluation that Daelyon appeared to be adjusting quickly and well to foster placement "with the exception of his sexually reactive behaviors, which is significant and has occurred in a number of settings." (Pet. Ex. 22 at 3.) He said that since Daelyon "responds well to positive feedback and structure. . . . [he] may very well be a good candidate for treatment." (Id.) By April 1999, Ms. Rodriguez believed Daelyon was demonstrating moderate progress in treatment and starting to increase his impulse control and frustration tolerance. (Pet. Ex. 27 at 1.) She reported to DCF that "[d]uring sessions he continues to work on managing reactions to past trauma so his functioning in daily life activities is not disrupted." She also believed that a stable foster placement made it "easier for him to work through issues of sexual reactivity and poor self esteem in therapy." (Id.)
Ms. Rodriguez testified that by the time of trial Daelyon was doing extremely well. (Testimony of Ada Rodriguez.) As a result, she has reduced his therapy sessions from once a week to once a month (although still visiting him and Sam C. at the foster home regularly). (Id.) Dr. Meier concurred at trial that Daelyon has shown tremendous improvement. (Testimony of Dr. R. Meier.) An example of his improvement is the fact that Daelyon did not get upset after seeing his mother for the April 2000 CT Page 2975 psychological evaluation, as he once would have. Mr. Rodriguez explained that living in a stable environment, where he feels safe and knows that somebody is there for him, has helped him overcome the distress that he used to feel from visiting with his mother. (Id.)
Daelyon needs a home environment where he will be nurtured and can be sure that his caretakers will always be there to care for him. (Testimony of Ada Rodriguez.) He needs to develop a sense of security. (Testimony of Dr. Meier) The home of Mr. Sam C., Daelyon's foster parent. meets those needs. (Testimony of Ada Rodriguez.) His therapist, Ms. Rodriguez. attributes Daelyon's improvement from his feeling safe and knowing that someone is always there for him well. (Id.) In light of the above evidence and all the facts and circumstances presented in this case, the court finds credible the opinion of Dr. Meier offered at trial that, in view of the length of time Daelyon has spent in foster care, from November 1998 to the present. it is in his best interest now to have permanency in his life as soon as possible. Similarly, the court finds credible the view of his therapist that the best permanency plan for Daelyon would be one that would provide him security and consistency.
4. The child Naequon
 a. Foster care placement history
After removing Naequon from his mother's custody on August 7, 1998, DCF first placed him in foster care at a location not disclosed in the evidence but then placed him that September with a paternal aunt, Chrystal G., living in Bristol, Connecticut, with her three biological children. (Pet. Ex. 6 at 4; Pet. Ex. 7 at 6.) A DCF social worker visiting him there in April 1999 found him to be healthy and happy in that household and "extremely bonded with his paternal foster family." The worker concluded that this foster placement met Naequon's physical and emotional needs. (Pet. Ex. 6 at 4 and 5.) The aunt became pregnant with a fourth child. however. and felt she could not continue to care for Naequon. When a paternal great-aunt and uncle. Bellamy and John U., expressed interest in providing long-term care for him. DCF reported in a June 1999 social study that it had decided. with Crystal G's support. to place Naequon with them. (Pet. Ex. 6 at 5.) They began visiting him regularly to establish a relationship with him (Id.). and at some point in 1999 Naequon went to live with them.[13]
Naequon adjusted very well to the new home and foster family. (Pet. Ex. 11 at 4.) By December 1, 1999, at a psychological evaluation of Naequon. Dr. Meier observed that he was "very attached to foster mother [Ms. U.] and calls her `mommy.'" (Pet. Ex. 19 at 4.) Dr. Meier concluded that: "[o]verall the child seems to be doing very well in this home. He CT Page 2976 appeared happy, active, and appropriately affectionate." (Id.) Almost two months later, at a second evaluation, Dr. Meier again observed that "the child is clearly showing a strong attachment to his foster mother, and by all appearances views her as the psychological parent. [O]bservations of the child with foster mother, and the progress made by the child developmentally and psychologically suggest that he is continuing to do well in his current setting." (Pet. Ex. 20 at 2 and 3.) After a third evaluation of Naequon in April 2000. Dr. Meier reiterated his view that Naequon was doing well in foster care with Ms. U. and viewed her as the psychological parent. (Pet. Ex. 21 at 10.)
b. Relationship to his mother, the respondent
Naequon was first placed out of his mother's home in August 1998, when he was less than two years old. During his first year in foster placement. DCF scheduled weekly visits for him with his mother and Daelyon at the Wheeler Clinic in New Britain. (Pet. Ex. 6 at 4.) Naequon enjoyed the visits but would become angry and withdrawn when his mother failed to show up for a visit. (Pet. Ex. 7 at 3.) In the December 1999 psychological evaluation. Dr. Meier observed that Naequon "does not spontaneously ask about his mother, but does not resist come for visits. However, he seems to be more excited about seeing the social worker than seeing his mother. Naequon . . . seems to be rather confused about the place his mother has in his life." (Pet Ex. 19 at 2.)
During the visits that occurred after their February 2000 resumption, Ms. C. missed fourteen of the scheduled eighteen visits. Ms. C. and Naequon were friendly with each other during the sessions, but Naequon did not refer to her as "mommy" and they interacted more as peers playing together than parent and chid. (Pet. Ex. 11 at 5.) After visits with his mother. Naequon would be agitated upon his return to the foster home. (Id.) Since living with Mr. and Ms. U, Naequon has not referred to Ms. C. or asked about her. (Pet. Ex. 12 at 2.)
In the April 2000 parent-child interactional evaluation conducted by Dr. Meier, "Naequon would speak to his mother periodically but spent much of the session playing alone. . . . Although he continued to interact with intermittently, he preferred to do so at a distance. Mother continued to urge him to show affection, but he squirm to get down and play by himself." Dr. Meier testified at trial that Naequon knows that Ms. C. is his biological mother. but regards her more as someone he sees regularly than as a parent figure or psychological parent. He testified that when she tried to elicit affection from him in the April 2000 interactional, for example by putting him on her lap, he would comply with her immediate request but try to get out of the situation immediately. He displayed very little affection toward her. (Testimony of CT Page 2977 Dr. R. Meier.) From the above-recounted information, and the totality of the evidence, the court thus finds credible Dr. Meier's conclusion that there is no longer any ongoing parent-child relationship between Naequon and his mother and that Naequon views his foster mother as his psychological parent. (See Pet. Ex. 21 at 8 and 9.)
c. Present needs and interest of the child
Naequon has been in foster care for more than two years. In his first lengthy foster placement, with his aunt Chrystal, he did well and showed no behavior problems in the home. In his current foster home with Mr. and Ms. U., the paternal great-aunt and uncle, he presents himself as active, bright, and happy. (Pet. Ex. 6 at 4.) Last academic year, he did well in day care (Pet. Ex. 11 at 3), and this year he is doing well in his pre-kindergarten class. (Pet Ex. 12 at 5.) In light of the above evidence and all the facts and circumstances presented in this case. the court finds credible the opinion of Dr. Meier offered at trial that, in view of Naequon's age and the length of time he has spent in foster care, it is in his best interest now to provide him with a permanent placement as soon as possible.
 II — ADJUDICATORY DECISION
As to the adjudicatory phase of this hearing of the petitions for termination of parental rights,[14] the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on March 22, 1999, until September 21, 2000, when the court granted the most recent amendment to the TPR petitions.[15]
 A. LOCATION AND REUNIFICATION
To terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110
or section 17a-111b that such efforts are not appropriate." General Statutes § 17a-112 (j)(1). Here, although the court found (1) on August 11, 1999, that reasonable efforts had been made to reunite Melissa C. with Naequon and that continued such efforts were no longer appropriate (Ward, J.) and (2) on January 11, 2000. r that continuing efforts to reunify her with Daelyon were no longer appropriate (Santos,J.), neither petition so alleges; instead, the department alleges in each that the respondent was unable or willing to benefit from reunification efforts. CT Page 2978
With respect to the statutory element of location and reunification, the court finds by clear and convincing efforts that the department made reasonable efforts to reunify Daelyon and Naequon with their mother, the respondent. The department offered a wide range of appropriate services to help reunite mother and children. DCF repeatedly offered Melissa C. referrals and assistance to address her substance abuse problem. The department referred her to parenting classes, provided a parent aid, and offered supervised visitations, all to help Ms. C. improve her parenting skills. The court finds, furthermore, that the respondent was unwilling or unable to benefit from these reunification services. She repeatedly missed supervised visitation sessions with her children, although the early improvement in her parenting skills during the initial months of visitation suggests that regular attendance might have been very beneficial to her. Despite numerous referrals and substance abuse evaluations, she failed to follow through on any of the treatment programs. As Dr. Meier stated in his May 2000 psychological report. the court concludes that Melissa C. "has shown little or no progress toward meeting treatment recommendations or expectations." (Pet. Ex. 21 at 9.)
 B. STATUTORY GROUNDS FOR TERMINATION — Failure to Rehabilitate — § 17a-112 (j)(3)(B)
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. To prevail in a non-consensual termination of parental rights case, DCF must first prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied. 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112
(j)(3)."In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the tiling of the termination petition or the latest amendment."In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
The adjudicatory date here is September 21, 2000, the date of filing of the most recent amendment to the original petition. The petitioner here claims one statutory ground for terminating Ms. C.'s parental rights: failure to rehabilitate under Section 17a-112 (j)(3)(B) of the General Statutes, which provides in relevant part:
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the parent of a CT Page 2979 child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child. such parent could assume a responsible position in the life of the child . . .
The court must determine whether the petitioner has proven, by clear and convincing evidence. that Ms. Melissa C. had failed, as of the adjudicatory date of September 21, 2000 to achieve the required degree of personal rehabilitation.
The term "rehabilitation" as used in the statute means "to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems." (Internal quotations omitted; internal citations omitted) In re Eden F., 250 Conn. 674, 706, 741 A.2d 873 (1999) "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D., 51 Conn. App. 829, 840, 724 A.2d 546
(1999). The statutory terminology "personal rehabilitation" thus requires the court to focus on the prospect of restoring a parent "to his or her former constructive and useful role as a parent. In re Tabitha P.,39 Conn. App. 353, 361, 664 A.2d 1168 (1995). "What is a reasonable time is a factual determination that must be made on a case-by-case basis" depending on the needs and situation of the particular child. In reShannon S., 41 Conn. Sup. 145, 154, 562 A.2d 79, aff'd, 19 Conn. App. 20,560 A.2d 993 (1989).
In conducting the inquiry as to whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that CT Page 2980 which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H., 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
"Thus the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting.' Id.
The evidence in the present case establishes beyond doubt, and by clear and convincing evidence, that the respondent has failed to rehabilitate herself. The initial presenting problems that led to DCF intervention in her family were reports of substance abuse, a slovenly home environment, and tired, hungry and depressed children. Substance abuse treatment and abstinence from drugs were necessary for the respondent to overcome these problems. As late as March 2000, however, she continued to drop out of drug treatment programs and have positive drug tests. Dr. Meier testified that since the respondent had actively used drugs and showed a pattern of not adequately caring for children and missing visitation appointments, at least six months of successful drug treatment followed by at least another six months of being drug-free would be necessary for her to be sufficiently rehabilitated to begin increasing her involvement in her children's lives. Yet her conduct at trial. initially arriving at the courthouse but then leaving before evidence began demonstrates, as Dr. Meier testified. the same pattern of inconsistency that characterized her visits with her children and her sporadic attendance for court-ordered evaluation — not the characteristics of consistency and stability that each child needs. Her present rehabilitative status is no different from when the neglect or the termination petitions began: Melissa C. remains a woman with a substance abuse problem that affects all her other conduct, and without motivation to enter or succeed in treatment.
During Dr. Meier's first psychological assessment of the respondent. on March 18, 1999, she showed that she did not perceive herself as having any problems. She did not recognize any personal responsibility for letting her children live in a slovenly environment:
 She is told that she has a messy house with roaches. Mother's response was that she lived in a project and all houses were like that.
(Pet. Ex. 18 at 2.) She did not acknowledge any fault in her care-taking for causing DCF intervention in her family:
 Mother was asked how DCF got involved. Apparently she was at her sister's house and a DCF investigator came CT Page 2981 to the home because her sister's children were not going to school. Ms. C. was then "turned in' for neglecting her children.
(Id. at 3.) She minimized the grave risk that Naequon and his one-year-old cousin had faced in the bathtub incident that led to Naequon's removal from her custody:
 One day mother went to the store and left Daelyon with her sister. A social worker came and asked where mother was. Since they did not feel sister was competent to care for the children, Ms. C. got into trouble. The children, mother and sister's children were placed outside the home. (Id.) And she did not acknowledge any problems or need to address them: Ms. C. denied having any counseling or therapy. She stated at first that DCF was going to put her "in the crazy house," but they found there was nothing wrong with her. . . . No problems with temper were acknowledged. Mother has little insight into her own behavior, and seems to be fearful that she will be seen as emotionally disturbed if she acknowledges problems. Even though she was asked about being depressed in having emotional distress, she did not acknowledge having attempted suicide, noting instead that the results of a psychiatric assessment found nothing wrong with her. . . . Ms. C. seemed to have a limited commitment to such expectations, often giving reasons what they were not appropriate, or why she could not complete them. She failed to acknowledge that she was dismissed from a number of programs. suggesting instead that she stopped attending because she did not feel they were appropriate. Ms. was very defensive in discussing any individual problems and takes no responsibility for any of the problems that have affected her family. Although she acknowledges drug use as recently as a month prior to the evaluation, she does not recognize that this life style has interfered with her judgment and responsibility with respect to her role as a parent. . . . Mother shows a great deal of denial, and therefore is not realistic regarding her treatment needs. She minimizes her problems with drugs, and agrees to participate in programs if expected to do so in order to have reunification considered.
CT Page 2982 (Pet Ex. 18 at 5 and 6.)
Her conduct since that date has shown no improvement in her willingness to accept responsibility for her actions or to address the problems that led to DCF intervention in her family. In addition to not remaining substance free, not completing substance abuse treatment. not seeing her children as often as DCF permitted, and not taking benefit of opportunities the department provided to improve her parenting skills, she has not gotten a job (or demonstrated a physical or mental disability preventing her from being able to work), not found permanent housing, and not improved her parenting skills. She does not show any sign of having benefitted from any of services that offered to help her address problems. There is no evidence from which the court could conclude she has even bgun the path to rehabilitation.
The court thus concurs with Dr. Meier's conclusion that "until mother shows more reliable improvement, the prognosis for her ability to discharge parental responsibilities appropriately is not particularly good." (Pet. Ex. 18 at 7.) In April 1999 Dr. Meier offered suggestions for Ms. C. to follow to facilitate her reunification with her children: participating in intensive drug treatment; individual counseling to address emotional and psychological issues including denial and avoidance of responsibility; parenting education: making all appointments and visits; demonstrating ability to provide for her children by finding appropriate living quarters and adequate finance resources: and identifying necessary services to use once her children were home. (Id. at 9.) Unfortunately, Melissa C. chose another path. There is no realistic or credible prospect that she could, within a reasonable period of time, assume a responsible position in the life of either child, each of whom needs permanency now. rather than to wait an indefinite period for the possibility she might some day begin to rehabilitate herself.
This is not even a close case. Neither by the adjudicatory date, nor by the date of trial. is there any evidence that the respondent has even begun the process of rehabilitation. Daelyon and Naequon each need permanency now. Waiting an indefinite period of time for Ms. C. to rehabilitate herself would be detrimental to them. The court therefore finds by clear and convincing evidence that the petitioner has proven that Melissa C. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time. considering the age and needs of the child, she could assume a responsible position in the life of either Daelyon or Naequon.
 III — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two CT Page 2983 phases. adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists. it proceeds to the dispositional phase. In the dispositional phase. the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112 (k).[16] In re Tabitha P., 39 Conn. App. 353,664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5. In the dispositional phase of this case, the court has considered the evidence and testimony related to circumstances and events up to and including October 31. 2000 the date upon which the evidence in this matter was concluded.
A. REQUIRED STATUTORY FINDINGS
The court makes the following written findings, as required by General Statutes § 17a-112 (k).[17] The court has considered these factors and its findings in determining whether it is in the best interest of Daelyon and Naequon to terminate the parental rights of their mother. Inre Quanitra M., 60 Conn. App. 96 (2000), cert. denied 255 Conn. 903
(2000).
 1. The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1).
The court finds that department provided timely and appropriate services to help Ms. C. address her substance abuse, learn how to provide better parenting to her children. and treat the emotional problems that led her to her suicide attempts. The services provided by the department were the very services identified by the court-appointed psychologist, Dr. Robert Meier, as necessary for her to resume a responsible parenting role. These included numerous referrals for substance evaluation and treatment and individual counseling and a parent-aid and supervised visitations that could have helped her improve her parenting skills. Unfortunately. though Ms. C. several times initially entered programs to which DCF referred her, she never completed any of them successfully; instead, such programs would eventually discharge her for not showing up or participating.
 2. Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federalCT Page 2984 Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2).
The court finds that the department made reasonable such efforts to reunite the family.
 3. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3)
The department, with the approval of the Court, set reasonable and realistic specific steps in order to facilitate reunification of the family. There was only minimal compliance by the mother.
In August, September and November 1998, the court entered the following expectations for the respondent mother to meet: (1) keep all appointments set by or with DCF, (2) cooperate with DCF home visits, announced or unannounced, (3) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF permits, (4) no substance abuse, (5) undergo drug and alcohol assessments and follow any resulting treatment recommendations, (6) participate in parenting, individual, and drug and alcohol counseling, (7) secure and maintain adequate housing and income, and (8) no involvement with the criminal justice system. As stated, with the exception of not being involved with the criminal justice system, Ms. C. did not comply with these expectations.
DCF, on the other hand, has fully complied with the court's November 1998 order to take all necessary measures to ensure the safety and well-being of the children, provide case management services, develop period treatment and permanency plans and review them with the respondent, refer her to appropriate services and monitor her progress and compliance, and monitor the welfare of the children and the circumstances of their care. It referred the respondent and minor children to timely and appropriate services, monitored her progress and compliance with court orders, ensured that the children remained safe and worked to ensure their well-being, monitored their welfare on an ongoing basis. and developed periodic treatment and permanency plans.
 4. The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k)(4)
There is no longer any parent-child relationship of a positive nature CT Page 2985 between the respondent and either of her children. Daelyon still loves his mother, misses her, even worries about her, but no longer has a relationship with her. He no longer looks to her for nurture. guidance, or to meet his day-to-day needs. Daelyon is now strongly bonded emotionally to the foster father, whom he now regards as his psychological parent. Naequon. who lived with his mother for a shorter period of time, less than two years. and has been in foster care for half of his life, no longer has much affection for the respondent. He is strongly emotionally bonded to and loves his current foster family, and views his foster mother as his psychological parent.
5. The age of the child — § 17a-112 (k)(5)
Daelyon, who was born on September 1992, is eight years old. Naequon was born on September 1996, and is four years old. In view of the age of each child and the length of time each has been in foster care, each needs a permanent placement and continuity of care now rather than continuing to wait for such.
 6. The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court max' give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child § 17a-112 (k) (6)
Melissa C., the respondent mother. has not made realistic and sustained efforts to conform her conduct to even minimally acceptable parental standards. The respondent has made virtually no effort to adjust her circumstances. conduct, or conditions to make it in the best interest of either child to return to her home in the foreseeable future. She continued to use illegal drugs. She repeatedly abandoned drug treatment programs. She maintained only sporadic contact with either child and missed many of the appointments the department scheduled to allow her a visitation with them. Giving her additional time would not likely bring her performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited with her.
 7. The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parentCT Page 2986 § 17a-112 (k)(7)
Neither respondent father nor anyone else has in any way prevented the respondent mother from maintaining a meaningful relationship with either child. There is no evidence of any unreasonable act of conduct of anyone that interfered with Ms. C.'s relationship with her children. The department encouraged contact between mother and children. Although Ms C. has not been employed and of limited financial means, economic factors did not prevent regular. continuing contact with either child or prevent a meaningful relationship with them. The department has provided access to and funding for all the services it offered to the respondent and which would have, if she had utilized them, given her the possibility of overcoming her problems and reuniting with her children. There is no evidence of, nor has the respondent claimed, any unreasonable conduct by the child protection agency.
B. BEST INTERESTS OF THE CHILD — § 17a-112 (j)(2)
The court is next called upon to determine whether termination of the parental rights of Melissa C., Leon C., and Roderick G. would be in the best interest of their children, Daelyon and Naequon.[18] From the evidence offered at trial, the court finds by clear and convincing evidence, for the reasons stated, that termination of the parental rights of all three respondents is in the best interest of each child.
The older child, Daelyon, lived with his mother longer than his younger brother. Daelyon still has a bond with his mother. He loves her very much. His therapist Ada Rodriguez has worked regularly with Daelyon for more than two years. She has seen and heard his both pain and anger and his progress and improvement. She testified that she believed Daelyon would be disappointed by knowing he would not see his mother again but would not have a more severe reaction. She also testified that the disappointments he has constantly suffered from his mother not showing up for visits with him have been worse for him than any disappointment he may feel if the court terminates her parental rights.
A decision to terminate his mother's parental rights may disappoint Daelyon and may. in Dr. Meier's opinion, make him angry. The court finds credible, however, the testimony of his therapist, Ada Rodriguez, and of Dr. Meier that it is in Daelyon's best interest to terminate his mother's parental rights. Any anger or disappointment he may feel is far outweighed by the pain. anger, and distress that he would feel and the harm he would suffer should the court not do so since his mother's conduct to date suggests that she will only continue the prior behavior that has already caused him so much stress and pain. CT Page 2987
Dr. Meier testified that Daelyon's contacts with his mother since removal from her home have had a very negative impact on his self-confidence and self-esteem, because his inability to meet the expectations she places on him has caused him a great deal of pain and guilt. Dr. Meier said that Daelyon seeks positive feedback from his mother and tries to interact with her on an emotional level, but all he gets in response is rejection that is very painful for him. It is harmful to Daelyon, Dr. Meier testified, when his mother criticizes him (for example, by saying "aren't you manly enough" to play football) or disappoints him (for example, by giving to Naequon a gift Daelyon brought for her or by missing scheduled appointments). Dr. Meier testified that he therefore believed that it is detrimental to Daelyon to continue to see his mother. Both Ms. Rodriguez and Dr. Meier testified that Daelyon needs permanency now, rather than to wait longer, for an indefinite future, to see if his mother ever overcomes her problems to the point that she can be a responsible and adequate parent for Daelyon.
The court finds the testimony and written reports of Ms. Rodriguez and Dr. Meier to be fair, thoughtful, and balanced in their analysis of Daelyon's affection for his mother, the stress and harm that she has caused, and the detriment to Daelyon of continued contact with her and lack of immediate permanency. The court finds their opinions and testimony to be credible and adopts their conclusions discussed above as its own. The court therefore concludes that the petitioner has proven, by clear and convincing evidence, that in view of the needs of the child for permanency, the lack of evidence that his mother can ever, or in the reasonably foreseeable future, assume an adequate parenting role, it is in the best interest of Daelyon to terminate the parental rights of Melissa C. It is, moreover, in his best interest as well to terminate the parental rights of his biological father, Mr. Leon P.
Naequon has lived with his mother less than half his life. He is strongly bonded to his foster parents, as well as to his previous foster mother, Chrystal, whom he continues to see. He is also attached to Daelyon, and the prospective adoptive parents of both children have already done activities together (introduced into evidence was a photograph of Daelyon's birthday party that Naequon attended) and plan to maintain this important relationship for the two children. Naequon has no bond left with his biological mother, no relationship with her. In the child-parent interactional evaluation session this year, for example, he mildly resisted his mother's request for a hug, and although allowing her to put him on her lap kept giving reasons he wanted to get down. Taking into consideration Nacquon's young age, the length of time he has been in foster care (which Dr. Meier testified exceeds the amount of time recommended for a child his age to be in foster care without permanency), his need for permanency and continuity, the lack of any CT Page 2988 remaining bond of affection with his mother, the close attachment he has developed to the prospective adoptive foster parents, his overall psychological and personal development while living in the foster home, and all the other facts and circumstances found to have been proven, the court finds by clear and convincing evidence that it is in Naequon's best interest to terminate the parental rights of Melissa C. and of Roderick G.
The court makes these findings of best interest in consideration of Daelyon's and Naequon's needs for a secure and permanent environment, the secure and nurturing relationship that each has developed with his foster parents at this time, and the totality of circumstances existing in this case. The court notes that counsel for the minor child has argued that termination is the best interests of the children.
 IV — ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the child's best interests to terminate the parental rights of Melissa C., Leon P., and Roderick G. accordingly
ORDERS:
The court hereby terminates the parental rights of Melissa C., Leon P., and Roderick G. as to Daelyon and Naequon;
The court appoints the Commissioner of the Department of Child and Families as the statutory parent for Daelyon and Naequon for the purpose of securing an adoptive family or other permanent placement for each child;
The court further directs that the children's present foster parents be given first consideration in adopting the children, given the strong connection each child has with his current foster family; and
Within thirty days of this judgment the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CT Page 2989 CHILD PROTECTION SESSION
 APPENDIX
The specific court orders were as follows: On August 10, 1998, the court, Swienton, J., instructed the respondent to take the following CT Page 2992 steps to facilitate return of Naequon to her custody:
 • Keep all appointments set by DCF. Cooperate with DCF home visits, announced or unannounced.
 • Keep whereabouts known to DCF and your Attorney.
• Visit the child as often as DCF permits.
 • Participate in counseling: parenting; individual;
 • Submit to substance abuse assessment and follow recommendation regarding treatment.
 • Successfully complete substance abuse treatment and follow recommendations regarding after care treatment including relapse prevention.
 • Accept and cooperate with in home support services referred by DCF.
 • Sign releases authorizing DCF to communicate with service providers to monitor attendance. cooperation and progress.
 • Secure and maintain adequate housing and legal income.
• No substance abuse.
Pet. Ex. 13.
On September 25, 1998, the court. Swienton, J., established the following Expectations of the Court to facilitate the respondent's reunion with both her children:
• Keep all appointments set by or with DCF
• Keep whereabouts known to DCF or your attorney
 • Visit the child(ren)/youth as often as DCF permits
• Participate in counseling CT Page 2993
 • Parenting — Creative Parenting Workshops
• Individual
• Drug/Alcohol
• Other: Random Urinalysis
• Secure/maintain adequate housing and income
• No substance abuse
• No involvement with criminal justice system
 • Other: Participate in hair-testing/sign releases for DCF to maintain contact with service providers.
(Pet. Ex. 14.)
On November 17, 1998, the court. Ward, J., instructed the respondent to take the following steps to facilitate return of Naequon to her custody:
 • Keep all appointments set by or with DCF. Cooperate with DCF home visits, announced or unannounced, and visits by the child's court-appointed attorney and/or guardian ad litem
 • Keep child(ren)'s whereabouts and your own whereabouts known to DCF. your attorney and the attorney for the child(ren).
 • Participate in counseling and make progress toward the identified treatment goals: Parenting; Individual. Treatment goals should include, but are not limited to, the following: Participate in individual counseling to address mental health issues. Participate in parenting educational sessions.
 • Submit to substance abuse assessment and follow recommendations regarding treatment.
 • Successfully complete substance abuse treatment CT Page 2994 including inpatient treatment if necessary and follow recommendations regarding aftercare treatment. including relapse prevention.
 • Submit to random drug testing; time and method of the testing shall be at the discretion of DCF.
• Follow recommendations of service providers:
 • Complete substance abuse treatment and follow all recommendations made by substance abuse
 • Recommended providers: Catholic Family Services, Creative Parenting Workshops CHMA
 • Obtain and/or cooperate with a restraining/protective order and/or other appropriate safety plan as approved by DCF to avoid further domestic violence incidents.
 • Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals. and for use in future proceedings before this Court
• No substance abuse
• No involvement with criminal justice system
 • Immediately advise DCF of any changes in the composition of the household to ensure that the change does not compromise the health and safety of the child(ren)
(Pet. Ex. 16.)